Good morning. If it may please the Court, my name is David Bricklin. I represent the Paradise Ridge Defense Coalition, some of the members here in the courtroom today. It's a beautiful place. It's a little bit of heaven on earth, I think they would say. It's also the remnants of a unique ecosystem that is said to be the most endangered ecosystem in the world. A few remnants left, many of them are right here. The idea of putting a five-lane highway along the base of this paradise is offensive, frankly, to many, but that of course is not this Court's decision to make. We're going to present some issues of law that we believe the agencies have made errors and ask you to rule on those. I'm going to start with an error of law related to the Executive Order 11-990 dealing with wetlands, where frankly I think this is the cleanest legal issue presented to the Court. It deals with the Executive Order's command that agencies, if there are several practicable alternatives, choose the alternative that does the least damage to the wetlands. And the agencies here frankly misunderstood the standard and misstated the standard. The agencies said that there was no practicable alternative that had no impact to wetlands. They didn't say that there was no practicable alternative that had less. They said there was no practicable alternative that had no impact to wetlands. And that's not the standard. So I think the opposing counsel was relying on, I think City of Dania Beach was cited a D.C. Circuit case indicating that the language of the Executive Order is not as dispositive as it might appear and that the agencies can balance a range of factors. Why is that approach not correct? So there's two reasons. First of all, in Dania Beach the Court found that the alternative that had a minuscule less impact, it was one one-hundredth of an acre difference, but the Court said it was not a practicable alternative. There's been no finding by the agency here that the alternatives to their selection, E2, are not practicable. They never said that. They said there's no alternative that has zero impact to wetlands. But they didn't say there's not an alternative with fewer impacts. That's not practicable. And in fact, in the context of the Clean Water Act, they said all of the alternatives they're looking at are practicable. But for the Executive Order purposes, they never made a finding that there's no practicable alternative with fewer impacts. They just said there's no practicable alternative with zero impacts. So that's very different than Dania Beach. Let me move on to the EIS issues. The first one I want to discuss is the Palouse ecosystem and the dangers that this highway project poses to those remnants. The agency acknowledges that this is an important vanishing habitat for wildlife, that it's one of the most endangered ecosystems in the United States, that the road will be a conveyance belt, if you will, for weed species that will invade these remnant ecosystems, and that the alternative they chose has the most impact of all the alternatives they were looking at. It comes closest to the largest remnants of any of the alternatives. They say that they will address this by – through mitigation. And in a case like this, where you have such a significant impact to such an endangered resource, it's important that the agency do a good job of discussing the expected effectiveness of the mitigation. And in the Cuddy Hill – Are you talking about the invasive weeds issue? Yes. Yes. So – and so your argument is they didn't – there was more they should have done to analyze the effectiveness of the mitigation measures. Is that – Yes. Is that your argument? And not only more, they didn't do any. So more than zero, yes. So they – so their argument is that the EIS, the final EIS, included a list of mitigation measures that they were prepared to undertake, and in fact that they were going to undertake. And they say that that was enough, including developing a project seed mix and giving funds to local landowners and the like. So why was that not enough? Because it's one thing to list mitigation measures. It's something else to say whether you expect them to be effective. And the – And is there a requirement that – to analyze – their argument is there's no requirement to evaluate their effectiveness at this point. Yes. They're wrong. The – this Court's Cuddy Mountain case and the Northwest Cemetery case both established that the effectiveness of the mitigation measures must be discussed. The amount of detail of that discussion is going to vary depending on how important the mitigation is to the overall project. In cases where – one of the cases they cite, for instance, the Okanagan Highlands case, where the impacts were quite small, the Court said, well, you don't need to do much in the way of discussing the effectiveness of mitigation. But in a case like this where the impacts are significant, you have an – ecosystem might go out of existence entirely, and they've acknowledged that they're going to spread weeds into it, here mitigation plays a big role. And there needs to be a adequate discussion of do you think this mitigation's going to work or not. This is not the first time a highway project has been built and is going to lead – allow for weeds to – weed seeds to come into an area. So the agency should have some information on how effective this mitigation is going to be. What's the track record? Has it worked or not in the past? And frankly, if they simply don't have a track record, they should say that so the decision maker knows that this is kind of a pig in the poke. So if they have information on how well this mitigation works, say it, yay or nay. If they don't have information on how well this mitigation works, say that. And in Cutty Mountain, they said that in particular. They said if you don't know how effective it's going to be, say it. And they don't say that here. I thought – I guess the argument that they're making about Cutty Mountain is that the mitigation there was so general that you couldn't tell exactly even what it was, whereas here they were very specific. Well yes, the – Does that make a difference? Well, I would argue it's not very specific here. They did list some things, but then they also said they're going to develop a – they're mainly relying on a vegetation management plan, which they have not specified the contents of that at all. But it's not really a question of whether they're specific about what the mitigation measures. It's will they work? What do you expect out of these? Are we putting – are these mitigation measures a hail Mary? And we're hoping they'll work, but you know, guess what guys? Nine times out of ten they don't do a very good job. Or is there information available that says these measures work? You know, we've used them in 16 other places and 14 times they worked beautifully and two times they worked pretty well. I mean, there's no information like that. So a decision maker who's saying, okay, am I going to pick this route that's going to create the most danger to the remnant ecosystems of any of the alternatives? And my staff tells me, well, but we're going to impose mitigation. And the decision maker needs to know, well, how effective is that mitigation going to be? And NEPA requires that, and it's just not there. On the – I also want to talk about the safety issue, another key issue in the case, where the agency has, I would say, dodged this issue and mischaracterizes what's in the record. The EIS pretty clearly relies on this model that comes up with a infinitesimal difference in 0.3 accidents per year, their chosen E2 alternative better than the next best alternative. We pointed out that 0.3 is meaningless in statistical terms, and the agencies basically concede that now, and the district court did acknowledge that as well. And instead, they've come up with a new argument. They say, well, the modeling was only a piece of it. We also exercised professional judgment. But when you look in the EIS, you do not find any indication that they exercised professional judgment. All you find is reference to the model. So is there a different model that they should have used, in your view? No. I don't know that there was a better model, but I think they needed to be – I think it was misleading for the EIS to say E2 is safest based on a model that they have pretty much now acknowledged can't be used to say that. So they should have used engineering – Is it your view they shouldn't have used that model, or – They can use the model – They shouldn't have used – how should they have determined safety, in your view? Let me answer both questions. First, should they have used the model? Yes, they should have used the model. I don't have a problem with them using the model. I have a problem with their characterization of the results of the model. The model came out with basically it's a wash, 0.3. We can't really tell that there's a difference there. But they characterized the model results as 0.3 would be E2 is a lot better. Was there information showing what the overlap was? Was that available? What the margin of error was for those various determinations? Apparently not. As best as we can tell from the record, the model does not allow them to come up with a standard of error of the way they applied it in this case. It gets complicated with statistics. The model should have been used, but it wasn't useful because it doesn't show the margin of error. I'm not totally understanding the argument. No, it's fine that they used the model, but when the results came out so close to one another, they shouldn't have said E2 is better than the alternatives because the results were too close to one another to make that determination. And I think they've conceded that now. They've conceded that. And then at that point, they should have applied engineering judgment and provided the best subjective analysis they could, not a... So they say they did that, so it's your view that they weren't clear enough that that's what they were doing? I would say they didn't do it at all. Certainly not in the EIS, which is where it was supposed to be. And the reason I say that is when you look in the EIS, the passages the government cites at page ER142, the road alignment characteristics, such as length, slope, and curvature, okay, these are engineering judgment assessments, are already considered in the model. And then it goes on to say weather conditions and microclimate are already considered in and reflected in the predicted crashes. So they did not exercise independent judgment. They noted these factors, but instead of using engineering judgment to evaluate them, they said we don't need to think about them. They've been addressed by the model. And then they misrepresent the results of the model. That's our problem. If they had been honest about this, Your Honor, and if they had really been looking at a subjective engineering assessment, they would have noted not just what made E2 safer in terms of fewer intersections and things like that. They would have noted in the EIS what made it less safe, which is there's a larger section of the old highway that is preserved in this alternative. That old section of highway is relatively unsafe because the E2 alternative includes more of the old highway. It becomes a less safe alternative. If they had done a subjective engineering analysis in the EIS, there would have been a discussion of that. And they would have said, okay, on the new section we're going to have fewer intersections, but on the other hand, we've got a longer stretch of the old highway. On balance, here's our judgment. That's not reflected in the EIS. That's what should have been there if they were going to do as they claim they did of using engineering judgment. I was going to try to address a few other issues, but I think I want to reserve the rest of my time. All right. Thank you. Good morning. May it please the court. I'm Summer Ingalls for the Federal Highway Administration. With me at council table is Gary Luke from the Idaho Transportation Department. He's available to answer any questions the court might have for the state. I'll begin with the safety analysis arguments. The point here is that the Highway Administration and the Idaho Transportation Department used the best possible model available to them to complete the safety analysis. At the time, the highway safety manual presented the most current and accepted knowledge and practices related to safety management. Do you acknowledge the opposing counsels as you now acknowledge that you can't really make a distinction on the safety of those routes based on that manual? Is that correct? No, we're not conceding and we haven't conceded in our briefing that the statistical analysis or the crash calculations are not useful. Certainly they're close, but they reflect that E2 is the safest by a slim margin. The rest of the analysis shows and the agencies determined in their expertise that E2 would be the safest because it's the shortest. It has the shortest period that runs through the suburban area. It has the flattest topography and it also has the fewest intersections. The agencies explained in the record that most of the crashes that would occur in each alternative would occur in the suburban section due to the existence of the turn lane. There are various points in the record. I'd point to SER 35 through 36, ER 206, 212 through 13, and 136 through 37 where the agencies explain in detail why the crash calculations make sense. Yes, they're close, but the record also explains why it was reasonable for the agencies to determine that E2 would be the safest. So the other point that opposing counsel makes is that although you're now saying that you have an engineering judgment, it's not reflected in the EIS. What's your response to that? I respectfully disagree. The pages I've just cited are the places where the agencies explain why given on-the-ground factors the safety analysis makes sense and why E2 is the safest alternative. Also, the notion that E2 preserves the most portion of the old highway was not because it's simply not in the briefing. We haven't conceded that this isn't useful. The other point is that the Highway Safety Manual doesn't require the use of confidence intervals. The agencies also explained that because the same factors were applied to each alternative, the confidence interval would be the same for each result and therefore wouldn't provide a reasonable basis to differentiate between the alternatives. I guess in layman's terms, the question is whether the information in the EIS was actually meaningful in showing E2 as being the safest route. And I think the underlying comment is it's not meaningful. You can't really tell if it's the safest based on the application of the Highway Safety Manual. I disagree. As I've explained, the Highway Safety Manual is the best tool available to the agencies to provide this information. The calculation showed that E2 is safe by a slimmer margin, but the agencies also explained why that made sense given their expertise and that was certainly reasonable. Can you address the argument that the mitigation measures for the invasive weeds, the effectiveness had to be evaluated and wasn't appropriately evaluated? I agree that the mitigation effectiveness needs to be evaluated. I point the court to SER 205 and SER 44 through 45. SER 205 is the weeds report that was attached to the FEIS that explains in detail the problems facing the area with weeds. And the report explains that weed mitigation measures are expected to reduce the widespread dispersal of weeds dramatically. Ultimately, though, the purpose of the mitigation analysis is to ensure that the agencies have disclosed the impacts of the project that they're considering. And the agencies did that here. They explained that the project is not expected to directly affect any rare plants or Palouse prairie remnants and that the greatest indirect effects to Palouse prairie remnants could occur through the spread of weeds. The agency didn't try to hide that. It explained those facts, but it also explained that various mitigation measures existed that given at this early stage in the project implementation process, the agencies expected would be productive. Those measures include, for example, using weed-free construction materials, reseeding exposed soils with native plants, using a special seed mix, employing best management practices, and as my opposing counsel has acknowledged, developing a vegetation management plan. But the agency is not required at this time to explain the specific inputs for that plan. It's sufficient to say that this is what the plan could include, and we will develop the specifics when the project is being implemented. I turn now to the executive order for wetlands. The language of the executive order says that the agency must determine that no practicable alternative to construction in wetlands exists, and the agencies did that here. The wetlands order exists to ensure that the agencies consider wetlands impacts in their NEPA analysis, but it doesn't create a specific duty above and beyond what's required by NEPA. This court explained in National Wildlife Federation v. Adams at 591 that the executive order extends a broader protective aura to wetlands than NEPA standing alone, but it doesn't create an additional duty. Here, reading the executive order to require the agency to select the least environmentally damaging alternative to wetlands is akin to reading in Clean Water Act LEDPA analysis. That section 404 analysis, to the extent that it's required, will come later. The Corps is not involved at this time, and the Federal Highway Administration isn't required to make the least environmentally damaging determination. So, opposing counsel says that you had to make a finding that it was not practicable to select the route with fewer impacts, and that instead of making that finding, you said only there wasn't a practicable one with zero impacts. The agency determined, yes, that there was no practicable alternative to construction in wetlands. There were a variety of project alternatives that were considered early on, like mass transit that wouldn't have involved wetlands impacts, but they didn't meet the project's purpose and need. The agency determined that each of the alternatives considered would require some impacts to wetlands, but it complied with the order because it explained that that was the case, and it also identified a variety of mitigation measures designed to diminish the effects to wetlands. Also, City of Dania Beach is on point here. There, the D.C. Circuit explained that an agency is not required to select the alternative with no wetlands impacts if it determines that another alternative is a better selection. Here, mitigation measures are discussed at 132 through 34, and 152 through 53 of the executive record, or the excerpts of record, and also in the supplemental excerpts of record at 38 through 40. There are a variety of measures that agencies will use to mitigate impacts. Determining that the agency had complied with the executive order was not arbitrary and capricious. I will address briefly the animal vehicle collisions issue. Again, the agency disclosed that E2 travels through an area with more wildlife, but it also explained that given mitigation measures that could be implemented, E2 didn't need to include any, the crash calculations didn't need to change for this selection. Clearing roadside trees and brush is proven to be an effective mitigation measure, as is using fencing to direct animals to appropriate places. I am happy to address other issues if the Court has questions, but apparently not. With no questions, I ask that the Court affirm. Thank you very much. Do you have some rebuttal time? Thank you, Your Honor. One thing I want to emphasize with the review of an EIS is that the Court reviews the EIS and not other documents. In both the briefing and in argument, there has been reference to statements by the government that are found in the record of decision, in support documents, this weed study, for instance. The issue before the Court is whether the environmental impact statement provides an unbiased analysis, an objective analysis. As we've said, we don't think it does. On the issue of the model, government says we are not conceding that the model isn't predictive that E2 is safer. If they are still holding that position, A, I'd note the District Court disagreed with them on that one, but for good reasons, we set forth in our brief at length, a 0.3 difference between these routes is too small of a difference to be viewed as significant, given the model's constraints. It's just not that accurate. It's like taking your kid's temperature, and if it's 98.6 one day and 98.7 the next day, is the temperature going up or down? You don't really know at that level of accuracy. We describe that in the briefing in much more detail. If the government is adhering to the idea that a 0.3 difference is statistically meaningful, I'd just ask you to review the briefs on that. We went into that in detail. On the issue of the mitigation and whether there's been an adequate discussion of that, of its effectiveness, this is where the government cites to a separate study that was not reproduced in the environmental impact statement. In other words, when you turn to the EIS itself, the discussion of the effectiveness of mitigation measures is not there. When you turn to the EIS, you will find the mitigation measures on a little table where they're listed and I understood them to be saying that it was not necessary to discuss the effectiveness of the mitigation measures. They merely had it disclosed, the potential impacts, and then they also disclosed what they were planning to do in response. But that effectiveness of the medication measures did not have to be discussed. Well, if that is their argument, then they're contrary to this circuit's and the Supreme Court's rulings. In the Robertson case in the Supreme Court, which I got to argue many years ago, the court announced that the mitigation measures have to be discussed in an EIS, excuse me, the effectiveness. This court's rulings in Cuddy Mountain, in Northwest Cemeteries, in the cases the government cites, all, including the Dania Beach decision, all hold that there has to be a discussion of the effectiveness. How much detail there is, and excuse me, it was the Okanagan Highlands case that the government cites, all of those cases hold that the effectiveness of the mitigation measures has to be discussed. The amount of detail of the discussion is going to vary depending on how important those mitigation measures are to the decision to be made. And again, to repeat, but in one of the cases the government cited, the Okanagan Highlands, therefore we don't require as much detail in the discussion of the effectiveness of the mitigation. And they contrasted that with the Cuddy Mountain case, where the impacts were more significant, and this court required a greater level of detailed analysis of the expected effectiveness. And so, you know, if the government is arguing that there's no requirement to discuss effectiveness at all, that just has no support in the circuit's for the Supreme Court's jurisprudence. Last, on the issue of the wetlands, the court, well the government talked about, well we have the right to balance various things, safety and environmental impacts from wetlands and the rest. That all goes into the determination of what alternatives are practicable, and that's part of the teaching of the Dania Beach case. The court there said, well, because the alternative is not as safe or not as this or that, it's not a practicable alternative, and therefore it's taken out of the equation. The agencies never made that determination about the other alternatives in this case. They never said the other alternatives were not practicable, and in fact, in the Clean Water Act context, they said they were practicable. And as the court's question to the government indicated, the government, which the government didn't answer quite clearly, but I think they basically agreed that they applied the test of zero, you know, are there any practicable alternatives with zero impacts. And it's really quite clearly stated in the EIS that that was the determination they made. Let me have that exact site for you here. Yeah, so that's at ER 134. In the environmental impact statement, it says there is no alternative which avoids all construction in wetlands. They never made the assessment, they never made the finding in the EIS that there was not a practical alternative that would not have less impacts in wetlands, and that would have been the correct standard to apply. Thank you very much, Your Honor. Thank you. Your Honors. We appreciate the arguments, and the case of Paradise Ridge Defense Coalition v. Hartman is submitted, and we are adjourned for this session for today.
judges: Fernandez, Ikuta, Sessions